April 26, 1957.

Record No. 4641.

Present, All the Justices.

The opinion states the case.

*Thomas L. Woodward* (*Woodward & Ferguson*, on brief), for the appellant.

*William W. Jones* (*Bangel, Bangel & Bangel*, on brief), for the appellee.

BUCHANAN, J., delivered the opinion of the court.

Amos M. Carter, the appellant, brought this suit against his wife, Clara Mae Ellis Carter, for a divorce *a vinculo matrimonii* on the ground of desertion which he alleged had occurred on October. 24, 1952. The wife filed an answer and cross bill alleging that her husband on or about October 30, 1952, cursed and abused her and drove her away from their home and had refused to be reconciled. She prayed for separate maintenance and support.

Depositions were taken by both sides over a period of nearly a year. On consideration of the evidence, after excluding some of it as remote and irrelevant, the court entered the decree appealed from. It denied the complainant a divorce and ordered him to pay the defendant for separate maintenance and support $65 a month, the costs of suit and a fee to her attorneys.

After the depositions were submitted and after complainant's counsel had declined the court's offer to confer with the parties concerning reconciliation, testimony of the parties was heard by the court *ore tenus* relating to their conduct with respect to reconciliation after October 30, 1952, which was afterwards excluded on motion of complainant's counsel.

In its decree the court found that the complainant ordered the defendant to leave their home on October 30, 1952; that her departure was not intended by her as a permanent separation and was justified under the circumstances; that the defendant thereafter sought reconciliation in good faith, which the complainant neither sought nor desired, and that her remaining away was in accord with his purpose and design.

The complainant assigns error to this decree and argues that its findings and provisions were not warranted by the evidence. The evidence covers some four hundred typewritten pages and need not be related in detail. Much of it deals with instances of quarrels, suspicions and jealousies which occurred many years before the separation of the parties and which, if of any substance, were condoned by their subsequent living together.

The parties were married on February 15, 1928. They lived with her parents for a while, then in Portsmouth, and afterwards on a farm conveyed to the complainant by the defendant's parents. Their home was within sight of the home of her parents. They had one child, a son, who was killed in an automobile accident on August 28, 1952, when he was twenty-three years old.

Their life together has not been tranquil. In 1949 a difficulty arose in which he cursed and struck her, which led to her leaving their home and going to the home of her parents for a stay of several months. He claimed this was brought about by her interest in and conduct with a cousin of his. She testified that it was the result of her refusal to find a clean shirt for the cousin after the complainant had struck him on the head in the course of a drinking episode and caused blood to drench the shirt he had on. When their son came in and heard about it he took his mother's part and threatened to whip his father, who told him, so the father testified, that if he could not respect him any more than that he could find another place to go. The son went with his mother and never returned to his father's house but made his home with his mother's parents until his death in 1952. He left a will giving all of his property to his mother.

The defendant suffered from asthma and other troubles and was frequently ill. When the news came of their son's death, at the suggestion of the complainant and pursuant to her doctor's orders, they both went to stay with her parents, where they lived together for seven weeks. The complainant testified that he and defendant's mother did not get along very well and he knew if he stayed there they would have a fuss, so he asked his wife to go back home with him several times, once in the presence of Mrs. Nora Holland. Mrs. Holland, testifying as complainant's witness, said the defendant was sick the whole time she was at her parent's home and was not able to go back. The complainant testified that he went back to his own home on October 24, 1952, and that his wife had not lived with him since; that he had talked with her several times about coming back and that he wanted her to come back; that the defendant was at his house when he came in one day and they talked over her coming back but that "she didn't seem to talk like she wanted to come back and I told her then I didn't ever expect to ask her to come back any more," and that he had never asked her any more to do so; that she never gave him any excuse for not coming back.

He further testified that on October 30, 1952, he came home from work in the field about dark, together with an employee named Elmer Holland, and found his wife, her mother and a colored woman named Harriet Johnson at his house cleaning up; that they all spoke to each other and he left to take two of his field hands home; that when he came back he and defendant's mother, Mrs. Ellis, had a fuss and he "cussed her out" and told his wife "that if she thought

more of her people than she did me to God damn it go stay with them;" that he had not seen his wife more than once or twice since then to talk to her, one of these occasions being in his yard and he then told her to make up her mind what she was going to do by the following Sunday; that he could not live like he had been living and he was going to get a divorce if she did not come back; that he started to shake hands with her when she left but she said ,"The hell with you, damn you," and drove out of the yard.

His witness, Elmer Holland, testified that when they got to the house on the night of the 30th the complainant said he believed Clara Mae had come back home and Holland said, "If she has come back home now . . . (D)on't go in there and have no fuss or nothing."

The defendant's version of what happened was very different from complainant's. She said that the complainant went back home about a week before she did because he said he had a barn full of cotton that might be stolen if he wasn't there; that she was then not physically able to go home, but a few days later, on October 30, she did go back, taking her clothes and other things with her with the purpose and expectation of staying. She took her mother and Harriet Johnson along and they gave the house a thorough cleaning. When her husband came in she could see he was drinking. He spoke to her and her mother in a sarcastic tone. He got some whiskey and took it out to the men who had been working for him. He did not come back until after dark and was then more noticeably under the influence of liquor. He cursed her mother and told the defendant to go back where she came from, where somebody thought something of her and where she thought something of somebody, to "get in that road and get in there in a hurry." She said she was then afraid to stay and did go back with her mother; that the complainant had never asked her since to come back to live with him; that she did, however, go back to the house two or three times a week to clean it and make his bed with the help of a colored woman until he stopped her.

On August 8, 1953, in response to a message from him through her counsel, she went back to talk to him. He told her he was tired of doing like he was doing; that he was going to fix himself so he could get a divorce; that "this is good-bye for keeps;" that he would give her until next day to decide who would get the divorce and if she did not he would; that even if she stayed there she would have to live on what her son had left her and that her mother, father and sister could not come on the place.

The defendant's mother and Harriet Johnson corroborated her testimony as to what occurred on October 30. The mother testified that the defendant was then not well but wanted to go back home and try to do the best she could; that while there a boy came to the house with a message from her husband to the complainant about some farm machinery; that the complainant "flew mad" and began cursing and abusing her husband. When she protested he held his fist over her head as if to strike her; that her daughter told him he should be ashamed of himself for talking to her mother like that and he then ordered the defendant to get out and go home.

Harriet Johnson testified to the same effect and stated that after the trouble was over the complainant said to her, "Well, Harriet, I told her where to get off at." This witness said the reason the defendant did not go back was because the complainant did not want her back and had told her not to come up there.

Harriet Johnson's son testified that he brought the message to the house from the defendant's father and that in the episode that followed he heard the complainant "cussing and carrying on" and heard him order his wife to go back to her parents' home, and afterwards heard the complainant say to the witness' mother, "I told them where to get off at," and also the complainant said to him, "Murray, I give them hell, didn't I?"

Not only does the complainant's allegation that the defendant deserted him lack the necessary corroboration (Code § 20-99; *Allen* v. *Allen*, 188 Va. 717, 720, 51 S. E. 2d 207, 209), it is also effectively controverted by the defendant's evidence. While he asserted that he wanted his wife to come back and live with him, the proofs demonstrate fairly conclusively that this avowal came from his lips rather than from his heart. When he was asked on his examination whether he would take her back if she came, he declined to answer and he refused the offer of the court to discuss a reconciliation. While he claimed that he could not get along with defendant's mother, he offered no details of such occurrences and no support for this contention. Her parents both testified that they treated him kindly in their home and elsewhere, and were hopeful that he and their daughter might compose their differences and live together.

While the evidence indicates that the defendant was argumentative and at times petulant and jealous, it also indicates that he furnished her a good many reasons for her attitudes and her suspicions, and that she was more sinned against than sinning. In spite of all that has

occurred she still maintains that she loves him and would like to live with him as his wife.

Desertion is composed, first, of the breaking off of matrimonial cohabitation; and, secondly, of an intent to desert in the mind of the offender. 6 Mich. Jur., Divorce and Alimony, § 18, p. 276. It does not necessarily depend on who leaves home. It is not limited to desertion of the home. It has the broader meaning of desertion of the marriage relation. If a wife is run away from home by her husband, or if he so behaves as to render it impossible for her to live with him in safety and in the reasonable peace and concord that should inhere in the marriage state, she is not guilty of desertion when she leaves for those reasons. *Defonis v. Clinchfield Coal Corp.*, 186 Va. 715, 719, 43 S. E. 2d 852, 854; *Latham* v. *Latham*, 71 Va. (30 Gratt.) 307, 321; *Williams* v. *Williams*, 188 Va. 543, 549, 50 S. E. 2d 277, 279.

In *Devers* v. *Devers*, 115 Va. 517, 520, 79 S. E. 1048, 1049, this that was said for the court by Judge Whittle is applicable to the present case:

". . . The well-being and good order of society demand that husbands and wives shall in good faith endeavor to reconcile their differences and dwell together in unity and peace, rather than to make occasion for resort to the courts for redress. It is against public policy to encourage such litigation, and it is not the province of a court to grant relief to a plaintiff whose misconduct has contributed to bring about, if indeed he did not connive at, the condition of which he complains."

The complainant excepted also to the requirement of the decree that he pay all the cost of the depositions on the ground that they were unnecessarily and unreasonably prolonged. He states in his brief that the cost should be apportioned because there is in the record "a mass of irrelevant, immaterial and extraneous matter" not involved in the proceedings or included in the pleadings. That is a fair appraisal of much of the evidence but there was a substantial contribution to this condition from the complainant's side of the case, and on review of the whole record we are not disposed to disturb the lower court's ruling on this point.

The decree appealed from was warranted by the evidence and is, therefore,

*Affirmed.*