# Richmond

VIRGINIA BRUCE BROOKS v. WILLIAM F. BROOKS.

January 26, 1959.

Record No. 4858.

Present, All the Justices.

The opinion states the case.

*T. Stokeley Coleman* (*William A. Wright; G. Kenneth Miller; May, Garrett, Miller & Newman*, on brief), for the appellant.

*Frank B. Beazley*, for the appellee.

SNEAD, J., delivered the opinion of the court.

 Virginia Bruce Brooks, appellant, was granted an appeal from a decree dismissing her cross-bill and awarding William F. Brooks, appellee, a divorce *a vinculo matrimonii* and custody of their infant son, Wayne Franklin Brooks.

In his bill, Brooks alleged as grounds for a divorce cruelty tantamount to desertion as of July 15, 1955. Among the allegations were charges that Mrs. Brooks was an excessive user of alcoholic beverages; that she neglected their three year old son; that she threatened his life and that of the child, and that she stayed out late at night and came home intoxicated. He prayed for a divorce *a mensa et thoro* to be merged into a divorce *a vinculo matrimonii* at the expiration of one year from date of desertion. He also asked that temporary and permanent custody of the child be awarded him; that appellant be enjoined and restrained from coming to appellee's home or place of business and from seeing their child until his custody could be determined. The bill was presented to the chancellor on September 2, 1955, whereupon he marked it filed and proceeded to hear testimony *ore tenus* of witnesses without notice to appellant. At the conclusion of the testimony on that date an order was entered awarding an injunction in accordance with the prayer of the bill and directing the sheriff of Caroline County to forthwith take possession of the child and deliver him to appellee.

On September 20, 1955, appellant filed her answer and cross-bill. In it she denied the material allegations of the bill and alleged acts of cruelty on the part of appellee equivalent to constructive desertion. She prayed for a divorce *a mensa et thoro*, temporary and permanent custody of the child and for his support and maintenance, as well as alimony, counsel fees and court costs. She also prayed that the injunctive order against her be vacated.

An order was entered on September 30, 1955 directing appellee to pay appellant $10 every two weeks as temporary alimony and to pay her counsel the sum of $50. Later he was ordered to pay her counsel an additional sum of $250.

On October 11, 1955 appellee filed his answer to the cross-bill and his amended and supplemental bill. There he denied the charges in the cross-bill and affirmatively alleged that appellant had been

married twice before her marriage to him; that appellant had deceived him in that she failed to disclose that she was "the notorious Peach Franklin Bruce" whose "reputation was well known not only in Caroline County but in adjacent counties". He also charged that appellee committed perjury before the Clerk of the Hustings Court of the City of Richmond when she made application for a license to marry her second husband, James Howard McAlister, in that she stated she was single and her name was Virginia Franklin Bruce when her true name was Peach Franklin Bruce Rollins; that when she was divorced from McAlister on January 15, 1951 she was permitted by the decree to resume her maiden name of Peach Franklin Bruce; that appellant again committed perjury when she made application for a license to marry him since she made oath she had been divorced only once and signed the certificate under the name of Virginia Franklin Bruce rather than Peach Franklin Bruce, which he asserted was done for the sole purpose of deceiving him and concealing the fact she was Peach Franklin Bruce.

Appellee further alleged that he did not learn that his wife was an impostor until a year before his amended bill was filed, and asserted that the marriage was voidable. He prayed that the marriage be annulled or in the alternative a divorce be awarded him.

The chancellor on October 21 and 27, 1955 heard evidence *ore tenus* upon appellant's motion to dissolve the injunction which prevented her from seeing and having temporary custody of the child. The testimony was perpetuated and made a part of the record. The injunction was continued and the child remained in custody of the father. A. W. Turner, probation and parole officer, was ordered to investigate and report upon the suitability and propriety of awarding temporary custody of the child to either parent based on the best interest of the child. After his report was filed, appellant was permitted to see her son at various times while in custody of other persons. On March 14 and 30, 1956 depositions on behalf of both litigants were taken before a commissioner in chancery. A decree was entered on October 14, 1957 dismissing Mrs. Brooks' cross-bill and awarding Brooks a divorce *a vinculo matrimonii* and custody of the child. By the terms of the decree Mrs. Brooks was permitted to see her son at the Courthouse at Bowling Green, Virginia, in the presence of a deputy sheriff between the hours of 10:00 A. M. and 12 Noon every other Saturday.

Appellant challenges the sufficiency of the evidence to sustain

a decree of divorce and custody of the child in favor of appellee. She contends the court erred in failing to grant her a divorce, alimony and custody of the child. She further contends the court erred in admitting certain evidence and that the conditions imposed in regard to visitation of the child were unreasonable and amounted to an abuse of discretion.

The litigants were married on June 23, 1951. According to a copy of their marriage certificate Brooks was 42 years of age and Mrs. Brooks was 39 years old. They lived in a hotel at Bowling Green for several months. Thereafter they resided until September 2, 1955 in a house on a secondary road about a mile from Bowling Green in Caroline County. Wayne Franklin Brooks was born of this union on May 31, 1952. Mrs. Brooks has no children by her former marriages. Brooks operates a service station in the county and he owns property valued at $18,000.

Early in the morning of September 2, 1955 Mrs. Brooks and the child rode with Brooks to Bowling Green where he parked his vehicle on a vacant lot, departed and unknown to Mrs. Brooks consulted with his attorney and a friend, George Wilkerson. He was gone about thirty minutes. Upon his return he raised the hood of the car, removed the distributor cap and left again. After a considerable time had elapsed she secured transportation from a friend who drove her and the child back home.

In the meantime appellee and his attorney journeyed to Fredericksburg where they met Sheriff Garnett Brooks and also appellee's aunt, Annie P. Chapman, who came down from Maryland pursuant to a telephone call appellee made to her the afternoon before. There the chancellor considered Brooks' bill of complaint, heard the testimony of Wilkerson and Mrs. Chapman and awarded the injunction above referred to.

Sheriff Brooks, who is a first cousin of appellee, secured a certified copy of the injunction order from the Clerk and he and his deputy, Massie Samuels, proceeded to the Brooks home to take possession of the child. The copy of the injunctive order was served on Mrs. Brooks who, after being advised of its purport, picked up the child. The sheriff and his deputy forcibly took Wayne, who was crying, from his mother's arms. Mrs. Brooks was informed that they would be back for her later. They delivered the child to appellee in accordance with the court order.

Approximately thirty minutes later the officers returned with a

truck to move appellant from the home. They had with them a subpoena in chancery and a copy of the bill of complaint to be served upon appellant. The rear door was locked but the front door was open and they entered it and proceeded to the living room, whereupon appellant retreated to her bedroom and locked the door. Upon her refusal to open the door, the Sheriff kicked it open as suggested by appellee, took from her the telephone she was using, and handed her the divorce papers which according to Sheriff Brooks she threw on the floor. He then put the papers in her pocket and she returned them to him. She was taken to the kitchen and during a scuffle her dress came unbuttoned. The sheriff handcuffed her, buttoned her dress and led her to the porch where he inquired of her what property she wanted moved from the home. She did not reply to his inquiry and she, in a house dress, was placed in the back seat of his automobile and driven to the courthouse and released behind the jail. From there she went to her sister's home and later to her mother's home. Counsel for appellant stated at the bar of this court she is now employed in Fredericksburg caring for someone's children.

The child was sent by appellee to Maryland to stay with Mrs. Chapman. Later Mrs. Chapman and her husband returned with the child to appellee's home where they have lived with Brooks during the pendency of this suit.

The printed record consists of 415 pages. As in the average case with such a voluminous record much of the testimony is immaterial and irrelevant, and it would prolong this opinion unduly and would serve no good purpose to evaluate all the evidence adduced.

The trial court found appellant was guilty of cruelty tantamount to wilful desertion and abandonment.

Section 20-99, Code 1950, which relates to the institution and conduct of divorce suits, provides:

"Such suit shall be instituted and conducted as other suits in equity, except that the bill shall not be taken for confessed, nor shall a divorce be granted on the uncorroborated testimony of the parties or either of them; and, whether the defendant answer or not, the cause shall be heard independently of the admissions of either party in the pleadings or otherwise; * * *."

In a suit for a divorce the grounds alleged as a basis therefor must be proved by full, clear and adequate evidence. *House* v. *House*,

102 Va. 235, 237, 46 S. E. 299; *Westfall* v. *Westfall*, 196 Va. 97, 102, 82 S. E. 2d 487.

Appellee testified as to several acts of cruelty allegedly inflicted upon him as well as acts of cruelty and neglect of the child which appellant denied. Most of the incidents occurred many months before their separation and lacked corroborative proof. Moreover, if true, they were condoned by subsequent cohabitation. *Carter* v. *Carter*, 199 Va. 79, 80, 97 S. E. 2d 663. Approximately six months before their separation and after a majority of the acts complained of had occurred, appellee executed a will leaving all his property to his wife. This does not indicate that at this time he was apprehensive of bodily hurt.

The evidence shows that appellant had permitted her son unattended to cross the road in front of her home to visit Preston H. Taylor's children on the other side. At times appellant watched his movements from her house and there were times when she did not observe him. According to Taylor the child looked carefully before crossing. He also said Mrs. Brooks had kept his children on occasions. Appellee argues that such conduct on the part of appellant constituted neglect and a disregard for the child's safety. We agree that it was not a wise and prudent thing to do, but we do not consider it a sufficient ground to deprive a parent of custody.

Appellant took the child to Colonial Beach on several occasions and returned late at night. In July of 1955 Deputy Sheriff Massie Samuels, at the request of appellee, followed Mrs. Brooks to Colonial Beach. He observed her there for about two hours. She took Wayne on some rides that were provided for children. He pursued her home where she arrived at approximately 11 P. M. When asked why appellee requested him to follow appellant, he stated appellee told him that Mrs. Brooks had been coming in late at night while drinking and he suspected she was going to the Beach, but he wanted him to check. Samuels, however, did not observe any drinking or misconduct on her part.

Appellee contends he was deceived by appellant when he married her in that she informed him that she had been married only once when in fact she had been married twice. Two notarized applications for marriage licenses were introduced. The first related to her marriage to James Howard McAlister. There it is stated that she was single. However, at that time she was divorced from Samuel Daniel Rollins. In the second application for a certificate to marry

Brooks it is stated that appellant had been divorced once when in fact she had been twice divorced. Appellant testified she thought a person who was not married was single regardless of previous marriage. She further stated her recollection was that she was asked by the deputy clerk if she had been previously married and her reply was yes. She also said "Peachy" was her nickname. The record at times refers to her as "Peach" and "Peaches".

Mrs. Brooks testified that appellee knew that she was Peachy Rollins; that he was acquainted with her father and had visited in their home on numerous occasions. She stated that "Blue-eyes Brooks" (appellee) formerly dated Mandy Rollins, sister of her first husband, and was acquainted with Rollins' sisters and mother. She also testified that she had known appellee four years before they were married, and that in 1949 she, at the request of appellee, accompanied him to the funeral of her mother-in-law, Mrs. Rollins. Regardless of this testimony, appellee stated in his amended bill that he knew that his wife was an imposter a year before it was filed. Yet he continued to cohabit with her and thereafter executed his will leaving her all of his property.

In August 1955 Mrs. Brooks was suffering with a bad knee. Mrs. Chapman, Brooks' aunt, volunteered her services and visited the home on August 20, 1955 where she stayed for a week. She said Brooks did not know of her proposed visit until plans had been completed. She testified she heard Mrs. Brooks say that she wished she could prove Brooks was not the father of her child; that she would kill the child before she would permit him to be taken from her; that she used profane language in the child's presence, and that on an occasion when they were eating crabs, Mrs. Brooks permitted her son to have six swallows of beer although they did not affect him. She further testified that on another occasion the following incident occurred:

"Well, I will say we were at the breakfast table one morning and we all, her and myself was talking. Of course, Mr. Brooks didn't do any talking the week I was down there. They seemed to be on the outs and they didn't do any talking, I mean conversation you see, but her and myself were doing the talking, so I said, 'Well, Virginia, you are not eating breakfast. You are trying to get your girlish figure back to be 16,' and she said, 'Well, there are plenty of 16's that would want him,' and I said, 'I don't know who they would be,' and she says, 'Oh, well, the Lord is going to punish them

all.' She didn't say who now. Mr. Brooks spoke up now and said, 'Well that sounds like some Davis—'. I forget the name now, and Mrs. Brooks jumps up from the table and grabbed the butcher knife and started after him. I grabbed her and I grabbed the butcher knife and I took her and I patted her on the back. Of course, she dropped the butcher knife in my hand. I patted her on the back trying to quite her down and she took both fists like this and she was standing up and she screamed just as loud as she could, 'Let me alone; let me alone,' screaming you know and she goes on in another room and she has a fit. When I say fit, she fell out on the bed and I had to give her ammonia and cold towels to her head, but she was all right when she had the butcher knife."

Mrs. Chapman's testimony was denied by Mrs. Brooks. Her counsel argue that it should not carry weight since Brooks conceded that prior to his aunt's visit he had consulted his attorney about ten times concerning his domestic affairs without his wife's knowledge and that her visit was for the purpose of obtaining evidence against her in this suit. In support of this contention they point to the occasion in July 1955 when appellee requested Deputy Sheriff Samuels to follow Mrs. Brooks and check on her activities. We observe from Mrs. Chapman's testimony that the Brooks appeared "to be on the outs and they didn't do any talking." If such be the case there must have been tension. Moreover, Mrs. Brooks was suffering from a bad knee and was not eating her breakfast. Under these circumstances a spouse may not be expected to act in a normal fashion. With such a background we do not consider this incident to be very serious.

We said in *Butler* v. *Butler*, 145 Va. 85, 88, 133 S. E. 756, and quoted with approval in *Raiford* v. *Raiford*, 193 Va. 221, 235, 68 S. E. 2d 888:

"The law does not permit courts to sever marriage bonds and to break up households merely because husband and wife, through unruly tempers, lack of patience and uncongenial natures, live unhappily together. It requires them to submit to the ordinary consequences of human infirmities and unwise selections, and the misconduct which will form a good ground for legal separation must be very serious and such as amounts to extreme cruelty, entirely subversive of the family relations, rendering the association intolerable."

Our conclusion is appellee has failed to prove the material al-

legations in his bill and amended bill by full, clear and adequate evidence and it was error to grant him a divorce.

■ This brings us to the question of whether appellant is entitled to the relief prayed for in her cross-bill.

The neighbors testified that appellant was a good woman, a good mother and "crazy" about the child. They had never seen her under the influence of intoxicants, although appellee said she drank alcoholic beverages to excess and several of his witnesses stated they had observed her drink. One neighbor, Preston H. Taylor did not approve of her permitting the child to cross the road unattended. Appellee's character witnesses testified they knew nothing against appellant. However, Sheriff Brooks and Deputy Sheriff Samuels did say that her reputation for truth and veracity was bad and that they would not believe her under oath.

While the court's injunctive order did enjoin and restrain appellant from remaining in or coming to appellee's home and place of business, it did not direct the sheriff to remove her from the home as it did the child. The sheriff's duty was to serve her with a copy of the order and leave the premises. If she did not obey it, then she could have been cited for contempt. Under these circumstances the court may have then ordered the sheriff to remove her from the home. But the sheriff acted hastily and followed the instructions of appellee who told him "to break the door down if necessary." She was handcuffed, forced from her home clad in a house dress, driven to the courthouse and released behind the jail and left to fend for herself. This was gross cruelty and humiliation, especially when inflicted upon a mother whose only child had just been taken from her without notice and who had no previous knowledge that a divorce action had been instituted against her.

Even after receiving this terrible treatment Mrs. Brooks, in spite of fear of her husband, attempted a reconciliation for the sake of the child. Brooks testified that he was unwilling to take her back under any circumstances.

Without discussing other incidents, we reach the conclusion upon a consideration of the record that the evidence clearly established appellee is guilty of cruelty tantamount to constructive desertion as of September 2, 1955, and appellant is therefore entitled to a divorce *a mensa et thoro* as prayed for.

■ The awarding of custody of children and the privilege of visitation by the parent who loses custody are matters which cause

courts deep concern. In the instant case several different arrangements were made from time to time for appellant to see the child, but apparently they proved to be unsatisfactory. The chancellor then authorized appellant to see her son, who is now six years old, at the Courthouse in Bowling Green in the presence of Deputy Sheriff Taylor every other Saturday between 10 A. M. and Noon. This arrangement still prevails. We cannot sanction this method of visitation under the circumstances in this case. We consider it unnecessary, humiliating to the mother, uncomplimentary to the father and not conducive to the best interest of the innocent child.

In *Mullen* v. *Mullen*, 188 Va. 259, 269, 49 S. E. 2d 349, the doctrine in regard to custody of children is stated thus:

"In Virginia, we have established the rule that the welfare of the infant is the primary, paramount, and controlling consideration of the court in all controversies between parents over the custody of their minor children. All other matters are subordinate."

Generally, where the child is of tender years and will be equally well cared for by either the mother or father, the mother, in preference to the father, should be awarded its custody. 6 M. J., Divorce and Alimony, § 55, p. 328.

A. W. Turner, probation and parole officer, in his report to the court stated:

"* * * Investigation into the background of both the complainant and the respondent does not indicate that either should be deprived of the custody of their child. Without going into the details, it appears that both parents have been indiscreet in the past; however, for the past four or five years, I am of the opinion that they have done very well and their conduct during this time would indicate that they were proper persons to have custody of their child. I was present in the complainant's home for about two hours while the respondent visited her child and during the opportunity afforded me, observed the child's attitude towards his parents. From my observations, he appears to be very fond of both the complainant and respondent; and he could not understand why his mother could not remain in the home with him."

The evidence does not show that Mrs. Brooks is a "notorious" person. According to neighbors, she has deep affection for her son and he is devoted to her. She has never physically harmed him. Unquestionably, she has had ample opportunity to do so if that were her desire. Apparently Brooks was not concerned about the child's

safety. If he had been, he would not have left him with his mother stranded in Bowling Green on September 2, 1955 and gone to Fredericksburg to seek an injunction and his custody. He would have taken the child with him or left him with a third person if he thought his son was in danger.

We find that the court erred in failing to award custody of their son, Wayne Franklin Brooks, to appellant.

The decree appealed from is reversed and the divorce awarded appellee is vacated. The cause is remanded with direction to enter a decree granting appellant a divorce *a mensa et thoro* on the grounds of cruelty and constructive desertion on September 2, 1955, alimony and custody of the child, with leave to appellee to visit his son and have the child visit him at reasonable times and places. The court below is further directed to ascertain and fix the amount of alimony and also support money for the child. A fee in the sum of $250 is allowed counsel for appellant for prosecuting this appeal.

*Reversed and remanded.*