## Richmond

### KAREN B. WHITE v. BENTON M. WHITE.

April 28, 1975.

Record No. 740382.

Present, All the Justices.

*Harry Pincus, Jr. (Doumar, Pincus, Knight & Harlan,* on briefs), for appellant.

*Frederick H. Creekmore (Creekmore & Rinehart,* on brief), for appellee.

Cochran, J., delivered the opinion of the court.

We are concerned in this appeal with the custody of six-year-old Benton M. White, Jr. (Ben), as ordered by decree of the trial court entered February 15, 1974, in which his father, Benton M. White, was granted a divorce *a vinculo matrimonii* from his mother, Karen B. White, on the ground of desertion. By this decree, custody of Ben, their only child, was awarded to the father, with rights reserved to the mother to have her son visit her every other weekend, for two weeks each summer, and for several days during each Christmas season. Mrs. White has appealed, contending that she is entitled to sole custody of the child. We do not agree.

Mrs. White filed her bill of complaint in the trial court July 11, 1972, seeking a divorce from her husband on the ground of

cruelty tantamount to constructive desertion. She also sought custody of Ben. White denied the allegations in the bill and filed his cross-bill asking for a divorce on the ground of desertion and for custody of his son. The trial court by order entered July 20, 1972, awarded temporary custody of the child to his father, with visitation rights reserved to Mrs. White each weekend, and directed the Chesapeake Department of Public Welfare to make an investigation to determine the fitness of the parents "to have the custody of or visitation rights with" the child and make recommendations to the court. Subsequently, the proceeding was referred to a commissioner in chancery to take evidence and report his findings to the court.

The evidence was taken by deposition before the commissioner in several sittings. Mrs. White's evidence relevant to custody consisted of her testimony and that of the young woman with whom she shared an apartment. It tended to show that Mrs. White and Ben enjoyed their weekends together and that Ben was properly cared for by his mother when he visited her.

White's evidence, in addition to his own testimony, consisted of the testimony of Mrs. White's parents and seventeen-year-old sister, and of the operator of the nursery school where Ben stayed while his parents worked. All agreed that Ben lived happily with his father.

Mrs. White attempted unsuccessfully to prove her husband's unfitness by reason of emotional instability. There was evidence of White's erratic conduct when he was trying to save the marriage. Thus, it was uncontradicted that White, despondent after his wife moved away with Ben in 1970, had attempted suicide, and that he had voluntarily undergone psychiatric treatment in a hospital in 1971. But the evidence also indicated that White's bizarre behavior was caused, in large part, by his wife's unwarranted and provocative attitude toward him before she finally deserted him in January, 1972, and that White's life now revolves entirely around his son.

White was unable to prove unfitness through immorality on the part of his wife, although there was uncontradicted evidence of her indiscreet association with another man after she and White had separated.

In May, 1973, the Chesapeake Social Service Bureau, pursuant to the court order, filed its report with the commissioner in

chancery, in which the Bureau concluded that White "can provide a more stable and loving environment than his wife could," and recommended that custody of Ben be awarded to his father. Based upon his observation of the witnesses who testified before him and his review of the Bureau's report, the commissioner reported that the best interests of the child would be promoted by awarding his custody to the father. The chancellor overruled all exceptions to the commissioner's report, and approved and confirmed the report in its entirety. A fair reading of the evidence leads us to the conclusion that both parents love Ben and that neither is unfit to care for and rear the child.

In determining custody, we are, of course, concerned first and foremost with what is best for the child. In the usual course the welfare of a young child will be best promoted by awarding custody to the mother, if she is a fit person and if other things are equal. *Campbell* v. *Campbell*, 203 Va. 61, 122 S.E.2d 658 (1961); *Brooks* v. *Brooks*, 200 Va. 530, 106 S.E.2d 611 (1959); *Mullen* v. *Mullen*, 188 Va. 259, 49 S.E.2d 349 (1948). This general rule is applied even when the father has obtained the divorce. *Moore* v. *Moore*, 212 Va. 153, 183 S.E.2d 172 (1971). If the evidence shows that the mother's home and the father's home are equally suitable for the child, then "other things are equal" within the meaning of the rule. *Lundeen* v. *Struminger*, 209 Va. 548, 550, 165 S.E.2d 285, 287 (1969).

In the present case, Mrs. White's home is not as suitable for Ben as his father's. At the time she testified before the commissioner, Mrs. White was sharing a one-bedroom apartment in Norfolk with a fellow hospital employee, Mrs. Sawyer, whose divorce proceedings were also pending. By the time the Social Service Bureau investigation was made, Mrs. White and Mrs. Sawyer had moved into a two-bedroom apartment, the tenth move made by Mrs. White in less than three years. Mrs. White and Ben could then share a bedroom. There was no fenced-in yard but there was open space in which Ben could play. The apartment was adequately furnished and maintained.

White's home was a two-bedroom apartment where he had lived for three years, with his wife and son until Mrs. White left, and with Ben alone after temporary custody of the child was awarded to him. Ben had his own bedroom. White maintained

the apartment, kept it clean, washed the clothes, and cooked for his son and himself. On his way to and from work at the shipyard where he was employed, White delivered and picked up Ben at nursery school. There was a fenced-in yard behind their apartment where Ben played with other neighborhood children and with his puppy and rabbit. He was mascot for the "midget league" football team that was coached by his father. Several times each week White and Ben visited in the home of Mrs. White's parents and sister, all of whom had become alienated from Mrs. White. From time to time the child was in the company of White's mother and sister-in-law, whose homes were also within a few miles of White's apartment.

Suitability of the home is not to be determined merely by comparing physical accommodations or material advantages. Indeed, in the present case, the evidence discloses little physical disparity between the two apartments. Moreover, as both White and his former wife are employed at full-time jobs on approximately the same schedules neither has any more time available to spend with Ben than the other, except that Mrs. White apparently leads a more active social life. But suitability depends, to a great extent, on the warmth and stability of the home environment and the kind of home life which the child can be expected to experience. Living with his father Ben enjoys not only the dedicated attention of a devoted parent, which his mother might also provide, but also the companionship of children in the neighborhood where the child has resided for nearly three years and the affectionate interest of White's mother and sister-in-law and of Mrs. White's parents and sister.

Although the evidence did not show that the mother was an unfit parent, it did show that her home was not as suitable for Ben as the father's home. Accordingly, we hold that the chancellor did not err in awarding custody of the child to the father, with visitation rights reserved to the mother.

*Affirmed.*

Carrico, J., dissenting.

As stated in the majority opinion, the controlling rule is that in the usual case the welfare of a young child will be promoted by awarding custody to the mother, if she is a fit person and if

other things are equal. While conceding the fitness of the mother, the majority denies her the custody of her young son upon the slender reed of a finding that her "home is not as suitable" as the father's. Although this particular finding is difficult to support, given the history of the father's emotional instability, even if the finding is accepted I believe it insufficient to warrant the result reached by the majority. The finding does not, in my opinion, make "other things" unequal between the mother and father. I would reverse, adhering to the established principle that "the mother is the natural custodian of her child of tender years." *Mullen* v. *Mullen,* 188 Va. 259, 270, 49 S.E.2d 349, 354 (1948).

I'Anson, C.J., joins in this dissent.