## Richmond

### JOHN JUNIOR BROWN

### V.

### EDITH KITTLE

June 17, 1983.

Record No. 801767.

Present: All the Justices.

*Henry M. Schwan* for appellant.
*Morgan Brooke-Devlin* for appellee.

COCHRAN, J., delivered the opinion of the Court.

In this child custody case, the question presented on appeal is whether the trial court erred in vacating an order entered by a juvenile and domestic relations court awarding custody of an illegitimate child to his father. The trial court's ruling was based upon its finding that the father had come into court with "unclean hands." The father, John Junior Brown, contends that the "unclean hands" doctrine must give way to the established rule in custody disputes that the welfare and best interests of the child are controlling. We agree and will reverse the order of the trial court entered on August 1, 1980, and clarified by order entered on September 11, 1980, *nunc pro tunc* August 1, 1980.

Edith Kittle and Brown, both married, became sexually involved in 1970; a son was born of the illicit relationship on August 1, 1971. Kittle was divorced in 1975; shortly thereafter, the child's name was changed to John Junior Brown, II. Johnny lived with his mother in a home in which Kittle's other five children also

resided.[1] Nearly every day, Brown visited Johnny. In August of 1978, Brown, because of conditions in the Kittle home which he believed to be detrimental to the child, received Kittle's permission to take Johnny to Florida for a visit. Brown sold his home and business in Canton, moved his wife of over 20 years and Johnny to Florida, and never returned the child to Ohio.

Kittle instituted custody proceedings in Ohio. The transcript of the proceedings was made a part of the record in the present case. Brown did not personally appear in Ohio but was represented by counsel. Brown's attorney moved for a continuance so that a deposition of Brown could be taken, a study of Brown's new home could be prepared by Florida authorities, and psychological tests could be administered to Brown, Kittle, and Johnny. The Ohio court agreed to consider the Florida home report if it was filed before the court announced its decision but refused to grant a continuance. The record does not indicate whether a Florida home report was ever submitted.

Three of Kittle's neighbors, her minister, a day-care center worker, Johnny's first grade teacher, three Kittle children, and Kittle testified at the Ohio hearing. The evidence tended to show that the Kittle home was fairly neat, but somewhat crowded; that Kittle managed the household adequately, with the children helping with many of her responsibilities, including the care of Johnny; that one of the Kittle children had caused trouble by running away, smoking marijuana, drinking, and even threatening to commit suicide, and another had problems at school, but Johnny was generally well-behaved; and that Johnny's performance in school was unsatisfactory in some areas but he was going to be passed to the second grade.

There was evidence that Johnny shared a room with his half-brother Ronnie. Kittle denied, on cross-examination, that Ronnie had made sexual advances towards Johnny, although she conceded that Johnny had told her Ronnie was "trying to play around with him." Kittle said Johnny would continue to share a room with Ronnie if custody was awarded to her.

One of Kittle's daughters testified that when she was 17 Brown had forced her to engage in sexual intercourse with him. Some of

---

[1] Two of these five children had moved to other housing by the time Johnny left the Kittle home in Canton, Ohio.

her testimony, however, suggested that if any intercourse occurred it may have been a consensual act.

By order entered December 11, 1978, the Ohio court awarded custody to Kittle, ordered Brown to make specified support payments, fixed visitation rights, and ordered Brown to return Johnny to Kittle in Ohio. Pursuant to this decree, a Florida court, applying the Uniform Child Custody Jurisdiction Act, held that it did not have jurisdiction to redetermine the factual issues resolved in the Ohio proceedings, and ordered Brown to deliver Johnny to Kittle. Instead of complying, Brown moved to Virginia and in May of 1979 petitioned the Juvenile and Domestic Relations District Court in Norfolk to award custody to him. After a hearing, the court entered an order in September of 1979 awarding custody to Brown. Kittle appealed.

When her appeal was heard in January of 1980, Kittle argued that the Uniform Child Custody Jurisdiction Act should be applied, but in a *de novo* trial the trial court heard evidence *ore tenus* and reviewed the transcript of the Ohio hearing. Brown, his wife, his sister, his married daughter, a social worker, two psychiatrists, a clinical psychologist, Johnny's private school teacher, his Sunday school teacher, the minister at the church where the Browns and Johnny attended, Kittle and Millard Abbott, whom Kittle married in 1979, all testified. Both psychiatrists said Johnny reported being sodomized by his half-brother Ronnie in Ohio; one of them and the psychologist asserted that it would be harmful to Johnny to require him to return to Kittle's home in Ohio, and all three stated that his best interests would be served by awarding custody to Brown. All the evidence showed that Johnny was happy, well-adjusted, and healthy in Brown's home, that he was an average student and was improving, and that Brown was a fit and attentive father. Johnny, interviewed alone by the trial judge, stated that he preferred to live in Virginia with Brown, although he would like to visit his mother.

Brown testified that he was concerned about conditions in the home in which Johnny was being raised in Ohio; that Kittle's other children used alcohol and drugs; and that Johnny was being adversely affected by his surroundings. When Kittle told him in early 1978 that Ronnie had sexually abused Johnny, Brown began to make plans to remove him from that environment. Johnny told Brown that Ronnie had sexually molested him. Brown sold his home and business at a loss he estimated at $40,000 and moved

with his wife and Johnny to Florida. His source of income was disability retirement compensation that was sufficient to support his wife, himself, and Johnny. Brown said that he did not appear in the Ohio custody proceedings because his attorney warned him that since he was not married to Kittle he had no chance of being awarded custody of Johnny. When the Florida court would not let him testify concerning the best interests of the child, he moved to Virginia so that he could have a custody hearing on the merits. Brown corroborated his wife's testimony that when she first learned, shortly before they left for Florida, that he was Johnny's father she was upset, but had adjusted to the situation and now loved the child dearly. Brown conceded that he acknowledged "under duress" paternity of another illegitimate male but denied that he had fathered the child. He denied ever having had any sexual relationship with any of Kittle's daughters. There was evidence that Brown formerly drank to excess but that he no longer did so.

In an opinion letter dated July 22, 1980, the trial judge reviewed the history of the litigation, stating that in the proceeding initiated by Brown in the juvenile and domestic relations court, Brown reported the custody award to Kittle in Ohio but asked that for good cause custody be awarded to him, and that Kittle had appeared and contested Brown's petition. The judge stated that the evidence before him clearly established Johnny was loved and maintained "in a good home environment" by Brown and his wife, that Johnny wished to continue to live with his father and only visit his mother, and that the social worker, the psychiatrists, and the psychologist were of the "firm opinion" that it would be in Johnny's best interests to have him continue to live with Brown because of a "serious problem in Mrs. Kittle's family situation . . . suggested by these witnesses . . . ." Although the judge stated that nothing in the record suggested that Kittle was not a fit mother, he found that the child should not live with her while Ronnie lives there. He asserted that he was "required to find" from the evidence that custody should not be awarded to her "at this time."

The judge, citing *Alig* v. *Alig*, 220 Va. 80, 255 S.E.2d 494 (1979), stated that full faith and credit did not extend to the Ohio decree, that the decree could be given effect under principles of comity, but that it would not be so recognized because of the evidence. Noting that the custody order appealed from had been en-

tered before January 1, 1980, the effective date in Virginia of the Uniform Act, the judge stated that the Act did not apply and that the court had jurisdiction to consider the custody issue. Nevertheless, the judge opined that custody should not vest in Brown. Citing *McNeir* v. *McNeir*, 178 Va. 285, 290, 16 S.E.2d 632, 633 (1941), he stated that Brown, who had violated the Ohio and Florida court orders, "simply does not merit this court's favorable consideration" because "his hands are unclean." The trial court by order entered August 1, 1980, which incorporated the judge's opinion letter, vacated the custody order appealed from but expressly denied custody to Kittle. By supplemental order entered September 11, 1980, *nunc pro tunc* August 1, 1980, the court referred the matter back to the juvenile and domestic relations court for "any further proceedings involving the legal custody" of Johnny.

Implicit in the trial court's ruling is a finding that both Brown and Kittle are fit parents but that because of Kittle's "family situation" other things were not equal at that time and Brown's home was more suitable for Johnny than Kittle's. Such a finding would justify awarding custody to the father, *see White* v. *White*, 215 Va. 765, 213 S.E.2d 766 (1975), as indeed the juvenile and domestic relations court did. But the trial court, while denying custody to Kittle because of the evidence, declined to award custody to Brown because of his conduct in defying the court orders of two other jurisdictions.

We do not condone Brown's conduct either as a scoff-law or as a violator of generally accepted standards of morality. The evidence shows, however, that regardless of his transgressions and moral lapses Brown has been a devoted and dedicated father to Johnny and he and his remarkably understanding wife have made a good home for the child. Brown's removal of Johnny from Ohio through deceit was reprehensible,[2] but it is not questioned that this act resulted from Brown's genuine belief that the child was being sexually abused by his half-brother.

Under the equitable doctrine of "unclean hands," upon which the trial court relied, a party is denied relief because of his own inequitable conduct. In *McNeir* v. *McNeir*, 178 Va. 285, 16 S.E.2d 632 (1941), we held the doctrine foreclosed an attack in

---

[2] Brown's removal of Johnny to Florida in August of 1978 was not, however, in violation of any custody order; Kittle's custody suit in Ohio was not filed until Brown failed to return the child.

Virginia upon an otherwise valid Nevada divorce decree by a wife who alleged the decree had been obtained through fraudulent misrepresentations and testimony. The trial court dismissed the bill for the reason, *inter alia*, that the wife's sworn complaint showed she was a party to the fraud and perjury in Nevada and she, therefore, had "unclean hands." *Id.* at 290, 16 S.E.2d at 633. This refusal of relief, which we affirmed, did not affect any support rights of minor children since the McNeir children were adults when the Virginia litigation began. *Id.* at 289, 16 S.E.2d at 633. The withholding of equitable relief to punish a wrongdoer has been approved in other cases involving issues of family law but not where the rights of children were prejudiced by the result. *See Davis* v. *Davis*, 206 Va. 381, 387, 143 S.E.2d 835, 839 (1965); *Gloth* v. *Gloth*, 154 Va. 511, 555, 153 S.E. 879, 893 (1930).

█ Unlike *McNeir, Davis,* and *Gloth,* however, in the present case the equitable principles invoked to penalize the father adversely affected the interests of the child. Our first and foremost concern here, as in all child custody cases, is the welfare of the child. All other matters, including the misconduct of the father in violating court orders, must necessarily be subordinate. It is our duty to see that the child's best interests are promoted rather than to see that the father is punished by denying him relief to the detriment of the son. Brown's misconduct does not negate the implicit finding of the trial court that Johnny's best interests would be served by awarding his custody to Brown, and thus was an improper basis for the court's refusal to grant this relief. *See Moyer* v. *Moyer*, 206 Va. 899, 901-02, 147 S.E.2d 148, 149-50 (1966); *Taylor* v. *Taylor*, 285 S.E.2d 150 (W. Va. 1981); *State ex rel. Domico* v. *Domico*, 153 W. Va. 695, 172 S.E.2d 805 (1970); *Doran* v. *Doran*, 212 So.2d 100 (Fla. Dist. Ct. App. 1968), *cert. denied*, 218 So.2d 174 (1968); *Young* v. *Young*, 383 P.2d 211 (Okla. 1963). *But see Perrenoud* v. *Perrenoud*, 206 Kan. 559, 480 P.2d 749 (1971) (ruling that trial court did not abuse its discretion in refusing to allow mother to relitigate custody in Kansas since she defied California court orders which she had previously recognized as valid and had succeeded in modifying); *In re Marriage of Saucido*, 85 Wash.2d 653, 538 P.2d 1219 (1975) (*en banc*) (holding "unclean hands" to be absolute bar to relief).

█ We have never held that full faith and credit or principles of comity necessarily preclude relitigation of the issue of custody. *See Addison* v. *Addison*, 210 Va. 104, 168 S.E.2d 281 (1969).

*See also Alig* v. *Alig*, 220 Va. 80, 255 S.E.2d 494 (1979) (holding that Virginia court has power to modify foreign alimony decree as to future payments). In *Addison*, a final decree awarding custody to a husband was entered in South Carolina after the wife had moved to Virginia with the children. On the wife's petition, despite the South Carolina decree, a Virginia court awarded her custody. We affirmed, holding that evidence of a change in circumstances justified the Virginia court in not giving effect to the South Carolina decree.

Similarly, in the present case, there was evidence of changed circumstances, of improvement and development of the child during the time he had been with his father (now almost five years), and of cogent reasons why he should continue to live in his present home. The trial court properly determined what disposition would serve the best interests of the child, but then entered orders inconsistent with its findings. Neither the doctrine of "unclean hands" nor principles of full faith and credit and comity can justify this result. Accordingly, we will reverse the decree of the trial court, thereby reinstating the award made by the juvenile and domestic relations court of custody to Brown, with reasonable visitation in Virginia reserved to Kittle.

*Reversed and final decree.*