COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Coleman and Lemons[*]
Argued at Richmond, Virginia


LINDA CINTRON

                                        MEMORANDUM OPINION[**] BY
v.    Record No. 2169-99-2             JUDGE DONALD W. LEMONS
                                            JULY 5, 2000
DAVID A. LONG


            FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                      Timothy J. Hauler, Judge

            Deanna D. Cook (Bremner, Janus & Cook, on
            brief), for appellant.

            John N. Clifford (Clifford & Duke, on brief),
            for appellee.


     Linda Cintron ("mother") appeals the September 9, 1999

order of the Circuit Court of Chesterfield County granting David

Long ("father") custody of their thirteen-year-old daughter

("daughter"). On appeal, the mother contends that (1) the trial

court's order changing custody of the daughter from the mother

to the father is void for lack of subject matter jurisdiction;

(2) if subject matter jurisdiction existed, the trial court

abused its discretion in changing custody; and (3) the mother

should be awarded attorney's fees and costs for this appeal.

_____

     [*] Justice Lemons prepared and the Court adopted the opinion
in this case prior to his investiture as a Justice of the
Supreme Court of Virginia.

     [**] Pursuant to Code § 17.1-413, recodifying Code
§ 17-16.010, this opinion is not designated for publication.

Mother presents three additional questions for review - one concerning failure to grant a motion to reconsider and two pertaining to visitation. Our opinion renders it unnecessary to address these three additional questions on appeal. Because the trial court abused its discretion by changing custody of the daughter from the mother to the father, we reverse that ruling and remand to the trial court.

## I.  BACKGROUND

The mother and the father were never married and never lived together. He is sixty-four years old, and she is thirty-eight years old. The daughter was born on May 13, 1986. She lived with the mother from birth until August 13, 1999. The father visited the daughter approximately twice a year until she was four years old, at which time he stopped visiting until after her ninth birthday in 1995 when he visited "a couple of times." There was no further contact until November of 1997 when the father was given temporary visitation pursuant to his November 3, 1997 petition for visitation and custody. Dr. Leigh D. Hagan, a forensic and clinical psychologist, was appointed by the juvenile court to facilitate visitation.

On January 5, 1998, the father withdrew his petition for custody. From the Fall of 1997 until August 12, 1998, the father visited the daughter three times. His visitation rights were terminated in August of 1998 by the juvenile court.

-

The father appealed to the circuit court and, at the March 22, 1999 hearing, the judge began the proceedings noting "some additional observations, just from reviewing this file." He asked, "Why is a twelve year old controlling the issue of visitation?" He noted that while he was not going to force the daughter into a relationship with her dad that is "detrimental to her best interest," "I've got to ask myself why is a twelve year old controlling the issue of visitation. That's what my concern is." Prior to hearing testimony, the court stated,

> I hate to put this focus on a twelve year old child.
>
> *     *     *     *     *     *     *
>
> I think it's almost criminal to do that. Now, unfortunately the statute says I have to do that, and I will.
>
> But I tell you, I don't like it. I think it's wrong. I think it's empowerment to a twelve year old child who apparently has got too much power already.

Dr. Hagan testified that the mother was not supporting the daughter's re-introduction to the father, that the mother continued to exert great influence over the daughter and, therefore, the trial court should require visitation for the father and implement a specific schedule so that the daughter would be given the opportunity to form her own opinion of the father based on firsthand observations as opposed to the mother's negative feelings toward the father. Hagan stated that he had no reservation regarding the father's character, interest

-

or capacity to look after the daughter's interests and described him as "patient, courteous [and] respectful."  Hagan characterized the opinion the mother articulated of the father as "about as low an opinion as I've heard expressed.  It was bitter and hostile.  All on the theory of errors of omission rather than commission."  Hagan further described that encounter stating, "it's about as emotionally charged an atmosphere as I've ever had in my office in sixteen years."  The trial court reinstated the father's visitation rights.

On May 19, 1999, the trial court held a show cause/review hearing based on failure to comply with the court-ordered visitation.  The judge stated from the outset, "Let me be very clear about this.  If the information I am to receive from [the daughter] is suggestive of the fact that Ms. Cintron has interfered with Mr. Long's ability to start a relationship with this child, I'm going to transfer custody today.  That's the bottom line on this."

The evidence revealed that the daughter had, when she was six or seven years old, asked the mother to talk to the father to arrange visitation at least three times, all of which the mother refused.  Further, the trial court found that the daughter's attitude had "vacillated 180 degrees since the last time she was [there]" when she told the judge that she had "no reservations whatsoever about seeing her dad, re-establishing a relationship with him, and spending time with him."  The court

-

found her evasive in her answers and attributed the daughter's sudden refusal to cooperate with the visitation to the mother's efforts to undermine the establishment of any relationship between the father and the daughter. The judge noted that the mother could be held in contempt and then stated, "I'm going to put the parties back into visitation, and I'm going to tell them, point blank: If there are any other further violations of the order, somebody is going to jail." The court ordered a new schedule for visitation.

On June 14, 1999, in another show cause/review hearing, the evidence revealed that the daughter continued to refuse to visit with the father. Before the mother testified, the judge stated, "It's obvious we're being held hostage by a 13-year-old child, and I've got to ask myself who's the parent, and who's the child?" He went on to warn the mother,

> I'm not going to be held hostage by a 13-year-old child. Perhaps Ms. Cintron wants to allow herself to be held hostage by a 13-year-old child, and I'm assuming, for sake of this discussion, that Ms. Cintron is without blame in this. If she is without blame, then we've got a 13-year-old child that's calling the shots, over whom Ms. Cintron has no control. I'm not going to be held hostage.

> \* \* \* \* \* \* \*

> This [c]ourt's orders are not going to be thwarted by Ms. Cintron's lack of parenting abilities to control a 13-year-old child.

-

The trial court found that the mother was doing nothing to encourage visitation, only paying the court's order "lip service" and was not sanctioning the daughter or implementing consequences for her disobedience. The trial court determined that the change in the child's attitude indicated either a lack of the mother's parental abilities or the mother's undue influence. The judge stated, "I'm not going to be held hostage by a 13-year-old girl. Ms. Cintron chooses to he held hostage by a 13-year-old girl. I'm not going to be. She's either going to go visit with her dad, or she's going to live with her dad. And you can tell her that. And that's the choice she's got." The court noted that, "I'm just not playing a game with a 13-year-old." Before a new visitation schedule was implemented, the court again stated, "I'm not going to play with a 13-year-old, and I'm not going to be held hostage by her," "[the daughter]'s had the opportunity [to comply with the order] . . . [, a]nd quite frankly, she's been playing fast and loose with this, and I don't have the patience for it . . . as I've said repeatedly, I'm not going to be held hostage by a 13-year-old little girl[,] I'm not going to do it" and "I really don't have time to be playing a game with a 13-year-old little girl."

On August 13, 1999, the court again held a show cause/review hearing. The father testified that approximately 95% of the visitation schedule had not been completed and that the daughter threatened to run away. Dr. Marie Brown, based on

-

her home visits and telephone conversations with the daughter, the mother and the father, testified that the mother had a "verbally abusive and physically confrontational episode with the father." Brown testified that she suspected the mother to have "issues about the visitation." The father was described as "respectful," "cooperative" and "pleasant." Brown recounted an episode where the daughter was verbally abusive to the father, calling him "a prick" and telling him to "go to hell." Brown stated that "in thirty years of clinical practice, [she had] never [seen] such flagrant disregard for the court system," that the court was "made into a mockery" and recommended giving custody to the father and that the daughter be sent to boarding school to figure out her identity. The evidence further revealed that during the visitations, the daughter would stay in her room and "pout."

Before talking with the daughter in chambers, the trial court judge noted that it "w[ould] be as fruitless as the last time" and went on to state, "We have a thirteen-year-old child who is calling the shots here." After meeting with the daughter, the court noted its observations, stating, "I am not going to be manipulated by a thirteen-year-old. She has manipulated Mom. She is trying to manipulate Dad. She has manipulated everyone with whom she has come into contact." The court noted, "I have no intentions of leaving that child with Ms. Cintron. I'm going to change custody. If the child wants

-

to run away, that's Mr. Long's problem.  He's going to have to deal with that."

The trial court found that Dr. Brown's testimony was "a carbon copy" of what was heard from Dr. Hagan six months earlier, that it had doubts about the mother's parenting abilities and that it did not find the daughter's testimony credible.  The mother was found to be in contempt.  Custody was transferred to the father immediately, and the mother was instructed to pay the father child support in accordance with the guidelines.

## II.  SUBJECT MATTER JURISDICTION

Mother claims that the trial court's order of September 9, 1999 granting the father custody of the daughter is void for lack of subject matter jurisdiction.  Mother argues that since the trial court acquired jurisdiction solely by virtue of an appealed visitation petition, and father's custody petition was filed for the first time in the trial court after the appeal hearing, the trial court did not have original jurisdiction to entertain the custody petition filed for the first time in its court.  According to appellant, Code § 16.1-241(A) vests the juvenile and domestic relations district court with exclusive original jurisdiction of all cases involving custody, visitation and support of minor children.

Code § 16.1-244, however, states that the jurisdiction granted to juvenile courts shall not "deprive any other court of

-

the concurrent jurisdiction . . . to determine the custody, guardianship, visitation or support of children when such custody, guardianship, visitation or support is incidental to determination of cause pending in such courts."  Contrary to the mother's assertions, custody was incidental to visitation in this case and the circuit court had subject matter jurisdiction to transfer custody.

### III.  CUSTODY

When determining which custody arrangement is in the best interests of a child, the trial court is required to consider the evidence presented as it relates to the factors listed in Code § 20-124.3.  The trial court is not required to quantify or elaborate what weight or consideration it has given to each of the factors enumerated in Code § 20-124.3 or to weigh each factor equally.  See Sargent v. Sargent, 20 Va. App. 694, 702, 460 S.E.2d 596, 599 (1995).  The trial court's findings, however, must have some foundation based on the evidence in the record, and if the trial court's findings lack evidentiary support, its determination of child custody is an abuse of discretion.  Cf. Trivett v. Trivett, 7 Va. App. 148, 153-54, 371 S.E.2d 560, 563 (1988); Woolley v. Woolley, 3 Va. App. 337, 345, 349 S.E.2d 422, 426 (1986).  The trial court is vested with broad discretion to safeguard and promote the child's interests, and its decision will not be reversed unless plainly wrong or

-

without evidence to support it.  See Farley v. Farley, 9 Va.
App. 326, 327-28, 387 S.E.2d 794, 795 (1990).

This case implicates Code § 20-108 which states in
pertinent part, "[t]he intentional withholding of visitation of
a child from the other parent without just cause may constitute
a material change in circumstances justifying a change of
custody in the discretion of the court."  This provision simply
means that the first prong of the test articulated in Keel v.
Keel, 225 Va. 606, 611, 303 S.E.2d 917, 921 (1983), may be
satisfied by a finding of intentional withholding of visitation.
This provision does not mean that the second prong of the Keel
test dealing with "best interests of the child" has been removed
from the court's consideration.  See also Code § 20-124.3.

The mother argues that the trial court abused its
discretion by changing custody of the daughter from her to the
father.  We agree.  The trial judge explained his ruling as
follows:

> I don't find that Ms. Cintron has in good
> faith tried to comply with the orders of
> this [c]ourt.  I find she is in contempt of
> the orders of this [c]ourt, and I have
> serious questions about her individual
> parenting ability.  I said this before and
> I'll say it again, she's either in willful
> violation of this order or she is being
> controlled by a thirteen-year-old girl.
>
> I spoke with [the daughter], counsel
> each questioned [the daughter], and quite
> frankly, I don't put a great deal of
> credibility in anything that [the daughter]
> had to say.  I think [the daughter] was

-

> delivering a message, and I seriously doubt
> her ability to provide this [c]ourt with an
> informed judgment as to the status of her
> role in the relationship with Ms. Cintron
> and Mr. Long.
>
> I'm tired of having this case come back
> and forth here.  We have probably been in
> court once a month since March.  I don't
> know what the answer to this is.  I can't
> force a thirteen-year-old into a visitation,
> and I realize that.
>
> I feel like I have no choice at this
> point than to allow Mr. Long to exercise his
> parenting abilities, to see if there is
> better control.  I am transferring custody
> of this child to Mr. Long.

After awarding custody to the father, the trial court stated,

> Mr. Long, I don't know what you are
> going to do with this little girl.  I really
> don't.  She is out of control.  She has been
> oppositional.  She's been obviously
> indoctrinated for a long period of time that
> you haven't dealt with incarnate [sic].
>
> I don't know what the answer is.  I
> would hope that you will rely on the advice
> of the professionals who might be in a
> better position to give you the guidance
> that you need, because I can give you no
> guidance.

The trial court's stated reason for the decision and our review of the evidence in the record reveal that noncompliance with the court's orders rather than consideration of the factors in Code § 20-124.3 served as the basis for the court's transfer of custody.  Our review of the record demonstrates that the trial court, amidst its frustration with the daughter's consistent failure to comply with the court-ordered visitation

-

schedule and the mother's failure to sanction the daughter for such disobedience, responded by removing the child from the mother, her custodian since birth, and placing the thirteen-year-old girl with her sixty-four-year-old father who was a virtual stranger to her and with whom she hardly had the semblance of a relationship.

Although we are sympathetic to the frustration of the trial court in dealing with this difficult situation, "[i]n matters concerning custody and visitation, the welfare and best interests of the child are the 'primary, paramount, and controlling consideration[s].'" Kogon v. Ulerick, 12 Va. App. 595, 596, 405 S.E.2d 441, 442 (1991) (quoting Mullen v. Mullen, 188 Va. 259, 269, 49 S.E.2d 349, 354 (1948)).  Our Supreme Court has noted that "[o]ur first and foremost concern here, as in all child custody cases, is the welfare of the child.  All other matters, including the misconduct of the [mother] in violating court orders, must necessarily be subordinate." Brown v. Kittle, 225 Va. 451, 457, 303 S.E.2d 864, 868 (1983).  "The custody of minor children in such controversies is never to be given to one parent to punish the other." Rowlee v. Rowlee, 211 Va. 689, 690, 179 S.E.2d 461, 462 (1971).

It is apparent that the basis for the trial court's "serious questions" about the mother's parenting abilities were the child's consistent refusal to comply with the visitation schedule and the mother's failure to correct the child's

-

behavior, namely by use of sanctions.  Although the trial court criticized the mother for failing to use sanctions to achieve compliance, the trial court did not use sanctions either.  Only after custody was transferred was mother held in contempt and even then, the 30-day sentence was suspended in its entirety.

Additionally, there was no evidence that the child had adjustment problems in other areas of her life.  In fact, until this litigation the child participated in various athletic activities, dance classes, cheerleading, and performed well, both academically and socially, in school.  She was not in any trouble with authority figures and was not running away from home.

Because the record includes transcriptions of proceedings after the transfer of custody, we are aware that the trial court's prediction that the child would run away as a response to the transfer of custody came true.  Additionally, she was hospitalized in a psychiatric hospital and thereafter, upon release, was enrolled in a boarding school some distance from her home.

This case does not involve a custody determination between biological parents who lived together and jointly raised a child until a recent separation.  Similarly, this case does not involve a long separation of biological parents with a history of continuous visitation by the noncustodial parent.  Rather, this case involves unmarried biological parents who never lived

with one another, never jointly parented the child, and a thirteen-year-old girl with whom the father had virtually no relationship.  On the facts of this case, it was an abuse of discretion to transfer legal custody of this thirteen-year-old girl to her father who was essentially a stranger to her.

## IV.  ATTORNEY'S FEES AND COSTS

We find no basis for the award of attorney's fees and costs on appeal.

## V.  CONCLUSION

Accordingly, we reverse the order changing custody of the daughter from the mother to the father and remand to the trial court for entry of an order consistent with this opinion and for further proceedings as necessary.

Reversed.

-

Coleman, J., dissenting.

The bond between a parent and child is one of the strongest recognized in the law. Although the father, David Long, and daughter, Christan Cintron, had only occasional and sporadic visitations since her birth, the trial judge was correct in recognizing, in my opinion, that the best interest of the child, which is always the paramount concern in a child custody dispute, would be served by encouraging and promoting a relationship between father and daughter, even over the resistance and objection of the mother. Thus, I respectfully disagree with the majority that the trial judge abused his discretion in ordering that custody of the parties' thirteen-year-old daughter be transferred to the father.

The trial judge in this case was confronted with a situation in which the mother was persistently frustrating and resisting the court-ordered visitation between the daughter and father and, consequently, was influencing and supporting the daughter's unwillingness and resistance to the visitation. The trial court's decision to change custody was the most reasonable and viable remedy that the trial judge had available to effect the desired result and overcome the mother's and child's resistance and disobedience to the court's visitation order. Admittedly, the child had done well under the single parenting of the mother; nevertheless, in my opinion, the trial court did not err in finding that a material change of circumstance had

-

occurred, which justified the trial judge's remedy-of-last-resort while at the same time addressing the mother's and child's continued and persistent disobedience to the court's orders.  I would affirm the trial judge.

Admittedly, this case presents a difficult situation in which a father is being awarded custody of his thirteen-year-old daughter when he has only occasionally visited with his daughter since her birth and has no established close relationship with her.  Apparently, during the child's early years, the father did not attempt to establish a relationship with her, at least in part, because of the mother's hostile attitude and lack of cooperation.  While the record does not fully explain the reasons for the mother's attitude, it may well be that past events between the parents justified a level of resentment and hostility from the mother toward the father.  For whatever reason, the father did not pursue legal action in order to establish a relationship with his daughter until the child reached an age that she could exercise some judgment and volition.  However, when the child was six or seven years old, she had asked the mother to arrange visitation with her father, but the mother refused.  Although the father occasionally, albeit sporadically, visited his daughter over the years, in November 1997, he sought court-ordered visitation.  At one point during the two years of hearings regarding visitation, the child told the trial judge that she had "no reservations whatsoever

-

about seeing her father, re-establishing a relationship with him, and spending time with him." The trial court found that the father was a fit person to have a parental relationship with the child and the evidence showed that he was "respectful," "cooperative," and "pleasant." Although the court ordered visitation between the father and daughter, the mother has not cooperated in bringing about the visitation and has not encouraged the cooperation of the child. The court found that the child's attitude and resistance was due to the influence and lack of cooperation of the mother.

The trial court's efforts to effectuate a relationship between the father and daughter through visitation, and before resorting to a change of custody, are well documented in the record. The trial court first undertook to initiate the relationship by establishing visitation rights with the father and daughter and appointing a clinical psychologist to work with the parents and child to facilitate the visitation and deal with the mother's hostility and daughter's lack of cooperation. A second psychologist became involved to further assist in bringing about a relationship between the father and daughter. According to one of the mental health experts, the mother's attitude toward the father was "about as low an opinion as I've heard expressed. It was bitter and hostile . . . it's about as emotionally charged an atmosphere as I've ever had in my office in sixteen years." One of the psychologists testified that the

-

mother exerted great influence over the child and that she was not supporting the child's re-introduction to the father nor the court-ordered visitation.  In a further effort to enforce its visitation decree, the court attempted to exercise its contempt powers against the mother.  After three show cause hearings, in which the court threatened the mother with contempt, the court eventually held her in contempt for violating its visitation order when it finally awarded custody to the father.  In this vein, the majority suggests that the trial court might have more forcefully pursued contempt in order to enforce its visitation decree rather than order a change in custody.  However, in my opinion, that decision was within the trial court's discretion. I believe it was a proper exercise of the court's discretion to pursue that avenue by awarding custody to the father.  Holding the mother in contempt and fining or imprisoning her would have served only to exacerbate further the hostilities between the parents and to frustrate further the court's efforts to bring the child and father together.

I am not insensitive to the fact that the mother has been the sole caretaker and provider for this young girl from birth until her teenage years.  However, the trial court was not unmindful that in large measure the child's unwillingness to visit with her father was due to the mother's opposition and unwillingness to allow the father to have a relationship with the child.

-

The best interest of the child is always the guiding standard for all custody determinations and that decision is to be made after consideration of the factors in Code § 20-124.3. The trial court has broad discretion in making a custody determination that will serve the child's best interest, and we will not reverse that decision unless plainly wrong or without evidence to support it. See Code § 8.01-680; Brown v. Brown, 218 Va. 196, 237 S.E.2d 89 (1977). Code § 20-108 provides, "[t]he intentional withholding of visitation of a child from the other parent . . . may constitute a material change in circumstances justifying a change of custody in the discretion of the court." By enacting this provision in Code § 20-108, the General Assembly expressly acknowledged and sanctioned the remedy that the trial judge resorted to in this difficult situation. Where one parent disobeys and attempts to frustrate the order of a court and the rights of a parent to child visitation, the most viable solution to deal with a parent's recalcitrance and not to reinforce the parent's unwillingness to cooperate with a visitation plan may well be to change custody, as the trial judge did in this case. That is the difficult decision which a trial judge must make. In my view, the majority's holding seriously frustrates the efforts of a trial court to effectuate its decision to establish a visitation relationship between a parent and child when deemed to be in the child's best interest. The majority's holding severely limits

-

or disregards the power granted to a trial court by Code § 20-108 to enforce its visitation orders. Although the trial court's change of custody from the mother to the father may be considered a bold measure to enforce visitation, I do not see that such measure was an abuse of discretion. I would affirm the trial court, therefore, I dissent from the majority's decision.