# CIRCUIT COURT OF THE CITY OF ROANOKE

Jonnie Mae Blair Moorman

v.

Roger Clinton Moorman

September 17, 2003

Case No. CH 00-1190

BY JUDGE ROBERT P. DOHERTY, JR.

This matter came before the Court on the Plaintiff Wife's bill of complaint for a divorce, child and spousal support, and the equitable distribution of marital property, and on the Defendant Husband's answer and cross-bill. The Court granted the parties a divorce pursuant to § 20-91(9), Code of Virginia (1950), as amended, on March 28, 2003. Previously, the Court had set temporary spousal and child support. After numerous opportunities to observe the parties and their demeanor and to consider their testimony and arguments, the Court makes the following findings regarding temporary spousal and child support, as well as the following findings regarding the distribution of marital assets.

Husband and Wife were married in 1973 and had two children, both having reached their majority, the last one having turned eighteen years of age on June 14, 2003. Husband operated his own construction business from 1985 to the present and rehabilitated and sold investment real estate properties. Wife's primary responsibility was raising the children. However, she occasionally worked part time, and she helped Husband with his construction business by selecting interior decorations. Otherwise, her involvement in the business was limited. The parties separated on September 27, 2000.

*Husband's Annual Income*

At an earlier support hearing, the Wife attempted to show that the Husband's income was substantially greater than he had divulged in discovery or in his testimony. Although Husband ran his own construction business, Wife alleged his income from the construction business was under-reported and that it also included the rent and the annual profits on the purchase and sale of two or three houses per year for approximately the last twenty-five years. She proposed presenting numerous documents, testimony, and related evidence dealing with the rent receipts and with the purchase, remodeling, and sale of all parcels of real estate that the couple had bought and sold each year since 1978 for the purpose of showing Husband's annual income and his ability to earn income. Husband, on the other hand, maintained that he earned a limited income from his sale and rental of investment properties and from his construction business. To support his position, Husband represented to the Court that his income for 1997 was $24,617.00, for 1998 was $13,688.00, and for 1999 was $16,210.00.

In order to resolve the question of Husband's annual income, the matter was referred to a Commissioner in Chancery. After receiving testimony and documentary evidence, the Commissioner reported that Husband's income was *at least* $55,000.00 per year. The Commissioner also reported that the evidence was in conflict; that Husband had failed to report income; that the tax returns for the years 1997, 1998, and 1999 were not reliable; that Husband had admitted in a deposition to under-reporting his earnings and/or receipts for the year 1996; that some records were incomplete; that certain rental incomes were received in cash and not reported over the years; and that the current reported rental income was an unrealistic figure.

Both Husband and Wife filed exceptions to the Commissioner's Report. However, these exceptions, as well as the findings in the Commissioner's Report itself, have been rendered moot based upon new evidence that has since surfaced. Shortly after the presentation of evidence but before the Commissioner's Report was prepared, Husband sent a letter to the Commissioner in an attempt to explain some of the profits he made from capital gains arising from the sale of investment real estate. This letter was unsolicited and not under oath and, accordingly, was not included in the evidence considered by the Commissioner in reaching his conclusions. Nonetheless, it was reported to the Court. In a subsequent hearing, occasioned in part because of that letter, Husband declared that he had realized fewer

capital gains from the sales of the investment properties than the amounts alleged by the Wife. However, when confronted with the letter on cross-examination, Husband admitted that the figures presented in the letter were an accurate representation of the income derived from the sale of the investment properties.

The end result of all of this was that the Court went back and reviewed all of its notes from all of the hearings in this case, the entire case file, and the transcript from the Commissioner's hearing. The inescapable conclusion reached is that Husband has consistently misled the Court and lied under oath at all stages of this case concerning his income and assets. The testimony of the Husband, as well as the Commissioner's Report, which was based in part on that false testimony, are of no value to the Court in reaching the decisions necessary to conclude this case. Needless to say, a ruling on the objections to the Commissioner's Report would be an exercise in futility. Accordingly, the Court rejects the Commissioner's Report and charges the entire cost of the same, to include all expenses and attorney's fees incurred by the Wife for that proceeding, against the Husband. Counsel for Wife should report those costs to the Court so that they can be included in the final decree. Husband is guilty of violating the equitable doctrine of "unclean hands." *Brown v. Kittle*, 225 Va. 451, 456 (1983):

Because of the multitude of lies told by the Husband, his falsification of tax returns, and the double sets of books kept by him, a determination of his annual income is extremely difficult. For example, using his 1996 tax return as well as his business ledgers, Husband had an income of at least $86,829.00 for that year. His 1996 tax return indicates gross receipts from the construction business as approximately $158,058.00 with a profit of $34,316.00 based on an accrual method of accounting. A business ledger from that year, reflecting a cash basis of accounting, shows gross receipts of $158,058.00 and profits of $41,000.00. However, a second ledger presented by Wife indicates gross receipts of $210,562.23 for 1996. This would indicate that Husband had under-reported his income by $52,513.00 for 1996. Husband denies that this is his ledger and he denies that the "1996" at the top of the page is his handwriting. Wife maintains that it is Husband's handwriting on the second ledger. In light of Husband's numerous misrepresentations, the Court finds his testimony to be incredible. The Court further finds that for the year 1996, and for all the years to the present, the Husband either made or had the ability to make at least $85,000.00 annually. He will be held to that standard of income.

*Support*

A manifest injustice has occurred in this case because of the Husband's false testimony. At the support hearing on February 5, 2001, the Husband testified that he hoped to make as much as $25,000.00 to $30,000.00 that year, but that he had made only $16,210.00 in 1999, the last year for which he had tax returns, and $13,688.00 for the year 1998. Based on that evidence, as well as the debt structure of the family, their living expenses, the best interest of the child, their attempts to aid their adult daughter in college, their effort to keep their rental properties intact, and the fact that savings existed which could be drawn upon, the Court found that the presumption of § 20-108.2, Code of Virginia (1950), as amended, the child support guidelines, had been rebutted. It appeared as though the application of the guidelines would be inappropriate. Instead, the Court attempted to formulate a child and spousal support plan that would provide food, clothing, and shelter for both of the parties and their fifteen year old son, as well as to assist them in keeping their marital assets whole until the equitable distribution hearing. The Court ordered the Husband to pay the monthly house note for the residence in which the Wife and child lived and to provide them with $300.00 per week as a unitary award.

Had it not been for the false testimony of the Husband at the February 5, 2001, support hearing, the Court would have used the child support guidelines. The Court would also have found that the Husband earned $85,000.00 per year or $7,083.33 per month; that the Wife had no income and was not at that time voluntarily unemployed; that there was a monthly orthodontic bill for the child of $105.00 per month; that $169.00 was the monthly cost of the child's health insurance; and that the statutory chart fixed $852.00 as the basic monthly support figure. Taking all of that into consideration, the Court would have set the child support to be paid by the Husband at $1,126.00 per month. In addition to ordering the Husband to pay the monthly house note for the former marital residence in which the child and Wife resided, the Court would have also ordered the Husband to pay $500.00 per week as a spousal support cash payment. All of that totals $3,276.00 per month, plus the house note. Coincidentally, that figure is $271.07 less than what the Wife's budget indicated she spent at that time for herself and the child, plus the monthly house note. Had Husband paid that child and spousal support cash payment amount until the child's eighteenth birthday, he would have paid for 29 months at $3,276.00 and he would have paid three months of only spousal support at $2,150.00 per month. His total payments would have

been $101,454.00 through August 2003. As it is, assuming he is current on his $300.00 weekly unitary support payments, he should have paid $41,280.00 through August 2003. That is a difference of $60,174.00.

Although the Court can find no Virginia case directly on point, it is obvious that a retroactive modification of child and spousal support would correct the fraud perpetrated by the Husband and do equity. However, such a retroactive modification appears at first glance to be forbidden by statute. *See* §§ 20-96, 20-107.1, and 20-112, Code of Virginia (1950), as amended. Notwithstanding those prohibitions, the Virginia Supreme Court held in *Reid v. Reid*, 245 Va. 409, 414 (1993), that "[o]nce the amount of spousal support is determined, the statutes and case law specifically limit the divorce court's authority to retroactively modify that amount, *absent fraud on the court*. . . ." (Emphasis supplied.) The Court also finds that the same rationale applies to fraud involving the setting of child support. *See Cofer v. Cofer*, 205 Va. 834, 839 (1965), overruled on other grounds by *Singh v. Mooney*, 261 Va. 48, 53-54 (2001).

A fraud on the Court is precisely what occurred in the procurement of the February 5, 2001, unitary child and spousal support pendente lite judgment. The Court simply cannot allow someone to lie with impunity and profit from such arrogant behavior. "The judgment of a court, procured by intrinsic fraud, i.e., by perjury, forged documents, or other incidents of trial related to issues material to the judgment, is voidable by direct attack at any time before the judgment becomes final. . . ." *Jones v. Willard*, 224 Va. 602, 607 (1983). A voidable judgment "is defined as one which, though not a mere nullity, is liable to be made void when a person who has a right to proceed in the matter takes the proper steps to have its invalidity declared." *Evans v. Asphalt Roads & Materials Co.*, 194 Va. 165, 172 (1952). As a pendente lite judgment does not reflect the final judgment of the Court, a showing of intrinsic fraud may render that judgment void. Therefore, for the reasons previously stated, the Court invalidates, vacates and declares void the unitary child and spousal support judgment in this case that was granted on February 5, 2001. That judgment is now redetermined against the Husband, also for the reasons previously stated, in the amount of $1,126.00 per month child support and $500.00 per week spousal support cash payment, and the Husband is ordered to make the monthly house payment on the former marital residence in a timely manner. These judgments are made retroactive to February 5, 2001, the date for which notice was given for the support hearing. *See Russell v. Russell*, 35 Va. 360 (2001). Assuming the Husband continued to pay the $300.00 per week as previously ordered, his arrearage in child and spousal support

payments through August 2003 would be $60,174.00. This arrears support decision is not punitive in nature, but is instead based on the needs of the Wife and child balanced against the ability of the Husband to provide for those needs.

Even though this is a case of first impression in Virginia, the Court notes that this concept of retroactive adjustment of child and spousal support in the face of intrinsic fraud has been considered by the appellate courts of the State of Utah, a state with support statutes and legislative prohibitions against retroactive support adjustments very similar to those in Virginia. In fact, in the case of *Shelton v. Shelton*, 885 P.2d 807, 252 Utah Adv. Rep. 28 (1994), the Utah court cites the Virginia case of *Reid v. Reid*, supra, in support of their decision to allow retroactive modification of support awards when faced with fraud. They pointed out that "it is well established that a material misrepresentation or concealment of assets or financial condition as a result of which alimony or property awarded is less or more than otherwise would have been provided for is a proper ground for which the court may grant relief to the party who was offended by such misrepresentation or concealment. . . ." They go on to say that "clearly, a court should modify a prior decree when the interests of equity and fair dealing with the court and the opposing party so require." *Shelton*, 885 P.2d at 808. It is unusual to find a decision so immersed in Virginia legal precedent and logic, reciting a Virginia decision of first impression, rendered by a court of a sister state.

### Equitable Distribution

When taking the evidence in this case and making the decision on equitable distribution, the Court considered all of the factors contained in § 20-107.3(E), Code of Virginia (1950), as amended, as well as the evidence and facts previously set forth in this opinion. The Court is aware that the parties had a long term marriage of more than twenty-five years in duration; that the Husband was the primary breadwinner and that the majority of all marital assets were acquired by funds earned by him during marriage; that the Wife was a stay-at-home mother, working outside the home infrequently on a part time basis, but mainly raising the children, keeping the house, and providing all those necessaries of daily life that are required so that the Husband could devote his primary energies towards earning a living for the family; that both parties are in relatively good physical and mental health, although the Wife suffers from diabetes; and that the Wife incurred debts during the separation

of the parties which are claimed by her as having been necessary to maintain the appropriate standard of living for the family.

The parties stipulated to many of the facts dealing with equitable distribution. In accordance with their stipulations, agreements, and the evidence in this case, the Court finds that all of the assets held by the parties are marital, with the exception of some of those minor items of personal property already distributed by agreement among them. In accordance with those agreements, the Wife transferred any right, claim, title, or interest she had in the round oak table, the cabinet with glass doors, the pictures, the grandfather's fiddle, the sewing machine, the electric trains, and the quilts unto the Husband. This was accomplished by the parties without the need for valuation. The grandfather's fiddle is in the possession of the daughter and it will be up to the Husband to make whatever arrangements he deems appropriate to obtain possession of it. The parties agreed that each would keep as separate property those items of household furnishings and furniture each now has in his or her own possession. This also was accomplished without the need for valuation.

The marital property includes three pieces of residential real estate, all jointly titled in the names of both Husband and Wife. The Dell Avenue house is the former marital residence in which the Wife now resides. It has equity in the amount of $66,400.00 and a debt of $35,539.37 as of April 9, 2003. The combined equity and debt gives that house a total value of $101,939.38. Husband has made all of the payments on that debt, and he has reduced the indebtedness from approximately $43,674.36 since the separation of the parties. The Radford house is a now a rental house, but was formerly used by the parties' daughter while she attended college. It is valued at $44,500.00 and has no debt. The Husband collects the rent on that residence and keeps it.

The last house is the one on King Street. It was formerly a rental house but the rent ceased when the Husband began living in it after the separation of the parties. It is valued at $48,300.00, also without any debt.

At the time of their separation, the parties jointly held a $100,000.00 certificate of deposit and had joint savings in Wachovia Bank and the N&W Credit Union in the stipulated amount of $10,000.00. Those funds were removed by the Wife either shortly before but in anticipation of separation or after separation. $40,555.83 of those funds is currently escrowed in one of the lawyers' trust accounts pursuant to a previous order of this Court. The costs associated with the Commissioner's hearing had been paid from those funds prior to this date. The Wife paid a penalty of $3,700.00 when she cashed in

the certificate of deposit. However, an early withdrawal penalty would have ultimately been necessary as the Wife would have had to access the funds for the months Husband paid no support prior to the Court ordered payments, and it would have been necessary at the time of equitable distribution. That early withdrawal penalty will be shared by the parties. The Court is aware of the fact that Wife spent $5,400.00 of those funds for gifts for each of the children. The Wife also made $3,160.00 worth of credit card charges on a joint credit card after separation, and Husband paid that entire debt from his separate funds. Wife claims that the charges on the credit card and the funds removed from joint savings were necessary for support for herself and her son, although she spent some of the money to set herself up in a vending machine business that she no longer operates.

The $3,160.00 credit card obligation is the separate debt of the Wife. The joint credit card will be cancelled so that neither can charge to the credit of the other in the future.

There were two vehicles, both titled in the Husband's name. The 1986 Nissan pick-up is valued at $2,250.00 and the 1995 Chevrolet pick-up is valued at $4,075.00. Both of those vehicles are in the Husband's possession. Husband also has in his possession all of the construction equipment and tools valued at $20,000.00.

All of the insurance policies on the life of the parties and their children are marital property. Wife cashed in the policy on her life and received $4,525.00. The cash value of the policy insuring the life of the Husband is $11,500.00. The cash value of the policy on their son's life is $2,000.00. The Wife gave the life insurance policy on the life of the daughter to the daughter, but evidence was not presented as to whether this occurred before or after the separation of the parties. Accordingly, it will not be treated as marital property.

The Wife alleges that from the remodeling and sale of investment properties during the course of the marriage, Husband should have savings of approximately $523,000.00. Husband admitted that it would have been possible for him to have directed the capital gains generated from the sale of these properties into future purchases, maintenance, or savings. From the record, there is no indication that any of the capital gains were used for future purchases or maintenance. On the contrary, the record indicates that Husband ran the costs of these operations through his construction business, gaining the additional benefit of reducing his reportable income. However, only $110,000.00 of this money, in the form of a certificate of deposit and savings

accounts, is accounted for by Husband. This leaves an approximate balance of $409,000.00 that cannot be accounted for or located. Contrary to Wife's position, Husband claims that there are no assets other than those set forth in his exhibits. The burden of proving the existence of additional assets or a hidden fund is on the Wife, and she has failed to do so. Suspicion alone is not sufficient. *See Bowers v. Bowers*, 4 Va. App. 610, 617 (1987). Those funds allegedly acquired over more than a twenty-five year period could just as easily have been spent over that same time frame. The Court will not consider these alleged funds as marital assets.

The combined marital assets of the parties amount to $345,389.38. Their combined marital debt is $35,539.38. That debt is the mortgage note on the Dell Avenue house. Husband has asked for credit for the equity increase in the home occasioned by his payments on the house note in the amount of $587.32 per month since the separation of the parties. He testified that he made these payments from his separate funds, those being moneys he earned after the parties separated. He reduced the principle debt on the house, which is an increase in its equity value, in the amount of $8,134.98 through April 9, 2003, the last date for which figures were presented to the Court.

The Court had initially ordered the house note payments to be made by the Husband so that a home could be provided as shelter for the Wife and infant child of the parties, and it was a factor considered when the unitary award of child and spousal support was first entered. Thereafter, when that original support award was vacated because of the Husband's fraud, the Court again ordered the Husband to pay the joint house debt of the parties and set a lesser weekly support payment than it would have otherwise. The Court is mindful of the tax benefits received by the Husband resulting from his payment of the interest on the note and the monthly pro-rata real estate taxes, as well as the benefit he received by providing shelter for his Wife and infant child. Those factors, plus the increased value of the property, will be considered when dividing assets and making an equitable distribution monetary award. "Under Code § 20-107.3(E), the separate contribution of one party to the acquisition, care, and maintenance of marital property is but one factor for the trial judge to consider in deciding upon the appropriate monetary award. [The] trial judge is not required to quantify exactly what weight is given to each of Code § 20-107.3(E) factors." *Ellington v. Ellington*, 8 Va. App. 48, 56 (1989) (internal citations omitted). Appropriate credit will be given to these post separation payments. In addition, Wife will be responsible for one-half of the scheduled monthly house note payments made after the divorce was finalized on March

28, 2003. That amounts to $1,468.30 through August 2003 and will be paid as part of the monetary award.

The Court awards to the Husband the King Street House, the two pick-up trucks, his tools, the cash value of the life insurance policies on his and his son's life, and $53,150.00 of the joint cash. Wife shall receive the Dell Avenue house, the cash value of her life insurance policy, and $53,150.00 of the joint cash. The Radford house will be sold for its fair market value and the proceeds used to pay the joint house note on the Dell Avenue house. Any remaining funds from that sale will be split equally between the parties. The rent received on the Radford house, beginning April 2003, will be divided equally between the parties. Any rent already collected by one party but not divided with the other shall be divided and paid in full within thirty days of this letter opinion. Any rent received hereafter will be divided equally within one week of its receipt. The rent payments will not be offset for any reason. If either of the parties wishes to purchase the Radford property, they can do so by paying the Dell Avenue house note and by paying $4,480.31 to the other party within thirty days. At the end of thirty days, if neither party purchases the Radford house, it will be placed in the hands of a real estate agent at the listing price of $44,500.00.

In light of the equities of this case and the matters and law previously discussed and taking into consideration the Wife's separate credit card debt, her obligation for one-half of the house note payments after the divorce and through the month of August, the division of the marital assets, the house payments made throughout the course of this case from the Husband's separate funds through August 2003, and the rents collected and kept by the Husband, the Court makes an equitable distribution award from the Wife to the Husband in the amount of $23,000.00. That award shall be credited against the Husband's support arrearage of $60,174.00 through August 2003, leaving $37,174.00 owed. That remaining balance shall be paid out of the Husband's share of the cash distribution. After that payment, $15,976.00 of those funds will still be available to his credit. However, that residual money shall continue to be held in escrow until the scheduled final support hearing so that the Court can ascertain that all intervening arrearages have been paid, the Commissioner's fees have been resolved, and so that a source of funds exists from which attorneys' fees can be paid if so ordered at that time.